823 A.2d 769

JOSEPH TOMEO, PLAINTIFF–APPELLANT, AND SUSAN E. TO-
MEO, PLAINTIFF, v. THOMAS WHITESELL CONSTRUCTION
COMPANY, INC., A CORPORATION, DEFENDANT–RESPON-
DENT, AND JOHN DOE, (FICTITIOUS NAMED DEFENDANT),
DEFENDANT.

Argued March 3, 2003—Decided May 22, 2003.

*Mario A. Iavicoli* argued the cause for appellant.

*Robert M. Kaplan* argued the cause for respondent (*Margolis Edelstein*, attorneys; *Ian M. Sirota*, on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal involves a common-law tort action filed by an employee against his employer based on an accident that occurred while using a snow blower. The complaint alleges that the employer deactivated a safety lever on a snow blower used to clear snow from the walkways at the employer's premises and that the employer negligently trained plaintiff, Joseph Tomeo, in the use of the snow blower. The issue raised in this appeal is whether the alleged conduct of the employer satisfies the "intentional wrong" requirement of the Workers' Compensation Act, *N.J.S.A.* 34:15–8. The trial court denied summary judgment to the employer and a jury found in favor of plaintiff. The Appellate Division reversed, finding that the trial court erred in not granting summary judgment for defendant. We agree and affirm.

I.

Plaintiff was hired by defendant in 1988 to install sprinkler systems in commercial buildings. Whenever there was a snowstorm plaintiff and other employees were assigned to assist with snow removal from the employer's premises to avoid loss of pay. Consistent with that past practice, when plaintiff reported to work on January 9, 1996, Timothy Cahill, Vice President for Construction, assigned plaintiff and others to assist with snow removal. Although plaintiff had previously operated a snow blower for his employer at a different location, Cahill instructed Ken Williamson

to show plaintiff how to use one of two identical snow blowers. The snow blower was a Toro Model 1132. Although the evidence was contradictory concerning the extent and quality of the training Williamson provided plaintiff, plaintiff concedes there was some training. Plaintiff testified that Williamson removed the snow blower from his truck and gave him "a short version of how to start the machine," consuming approximately five to ten minutes. Before using the snow blower for snow removal, plaintiff used a shovel to clear snow from some steps. Plaintiff testified that after shoveling the steps, he used the snow blower at another building located about 500 yards across the street from where he had shoveled snow. He "turn[ed] the snow blower[ ]on when [he] got across the street" and "started to use it."

The Toro Model 1132 snow blower has a two-stage system. There is an intake propeller that grinds snow into the machine as it is self-propelled forward. The intake propeller delivers the snow to an ejection propeller that ejects the snow out through a chute. The two propellers work in tandem. The machine is equipped with a gear shift lever on one side of what is described as a handle-bar, like on a bicycle. On the other side is a safety lever that activates the propellers when squeezed and deactivates them when released. At the time of the accident, the safety lever had been taped in the operational position with electrical tape. Plaintiff, Cahill, and Williamson all denied taping the lever.

As plaintiff used the snow blower, some wet snow clogged the chute on two or three separate occasions. Each time plaintiff would use his hand to push the snow down in the chute and the propellers would then eject the snow through the chute. The last time plaintiff attempted that maneuver, the propeller that ejects the snow through the chute caught his hand, causing injuries to his fingers. Because the lever had been taped, the propellers continued to operate. There was no evidence from an expert or otherwise that taping the lever affected the time required to complete the snow removal.

After denial of defendant's motion for summary judgment based on the immunity provided in *N.J.S.A.* 34:15–8, bifurcated trials were conducted. At the conclusion of plaintiff's evidence presented in the liability trial, and after defendant rested its case, the trial court again denied defendant's motions to dismiss based on *N.J.S.A.* 34:15–8. The jury found for plaintiff in the liability trial; a separate jury awarded plaintiff $160,000 in damages. The Appellate Division reversed, concluding that summary judgment should have been granted to defendant.

We granted plaintiff's petition for certification, 174 *N.J.* 544, 810 A.2d 64 (2002), and now affirm.

## II.

Plaintiff argues that defendant intentionally disabled the safety lever on the snow blower to remove the snow more quickly so that the company could resume its normal business of installing sprinkler systems in commercial buildings. Defendant contends that plaintiff failed to prove that defendant taped the safety lever and that, in any event, the taping was not done for the purpose of speeding up production or creating "a substantial or virtual certainty that somebody would be injured" when using the snow blower. Defendant asserts that plaintiff failed to satisfy the "intentional wrong" standard because: (1) there was no expert testimony to bolster plaintiff's case; (2) there was no evidence of any prior, similar injuries sustained by defendant's employees; (3) there was no evidence that defendant forced plaintiff to hurry on the day of the incident; and (4) there was no evidence that any of defendant's representatives were aware that the safety lever had been disabled.

Procedurally, the standard of review controlling this case involves the summary judgment rule, *R.* 4:46–2, directed verdicts at the end of plaintiff's case, *R.* 4:37–2(b), directed verdicts at the end of all the evidence, *R.* 4:40–1, and judgments notwithstanding the verdict, *R.* 4:40–2.

The only distinction between 1) a directed verdict at the end of plaintiff's case pursuant to *Rule* 4:37-2(b), 2) a directed verdict pursuant to *Rule* 4:40-1 after all the evidence has been presented, 3) a judgment notwithstanding the verdict pursuant to *Rule* 4:40-2, and a summary judgment that allows a *Rule* 4:37-2(b) weighing of evidence to determine if a genuine issue of material fact exists, is that summary judgment motions are generally decided on documentary-evidential materials, while the directed verdicts are based on evidence presented during a trial. Under our holding today, the essence of ["]the inquiry [in] each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." [*Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986).]

Of course, there is in this process a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials. This process, however, is not the same kind of weighing that a factfinder (judge or jury) engages in when assessing the preponderance or credibility of evidence. On a motion for summary judgment the court must grant all the favorable inferences to the non-movant. But the ultimate factfinder may pick and choose inferences from the evidence to the extent that "a miscarriage of justice under the law" is not created. *R.* 4:49–1(a).

. . . .

Measured by that standard, a dismissal under *Rule* 4:37-2(b), *Rule* 4:40-1, *Rule* 4:40-2 or for failure to allege or prove a *prima facie* case, does not unduly intrude into the province of the jury. In those instances, there simply is no issue to be decided by a jury based on the evidence. A jury resolves factual, not legal, disputes. If a case involves no material factual disputes, the court disposes of it as a matter of law by rendering judgment in favor of the moving or non-moving party on the issue of liability or damages or both. Thus, ["]the right of trial by jury [remains] inviolate.["] N.J. Const. art. I, ¶ 9; *Weinisch v. Sawyer,* 123 *N.J.* 333, 342–44, 587 *A.*2d 615 (1991); *Shaner v. Horizon Bancorp,* 116 *N.J.* 433, 446–[47], 561 *A.*2d 1130 (1989); *Hager v. Weber,* 7 *N.J.* 201, 211 [81 *A.*2d 155] (1951); *500 Columbia Turnpike Assocs. v. Haselmann,* 275 *N.J.Super.* 166, 171, 645 *A.*2d 1210 (1994). Furthermore, the right to a jury trial has never prevented our courts from granting summary judgment in an appropriate case even before *Judson[ v. Peoples Bank & Trust of Westfield,* 17 *N.J.* 67, 110 *A.*2d 24 (1955)] was decided. *National Surety Corp. v. Clement,* 133 *N.J.L.* 22, 26, 42 *A.*2d 387 (E. & A.1945); *Jasion v. Preferred Accident Ins. Co.,* 113 *N.J.L.* 108, 110–111, 172 *A.* 367 (E. & A.1934); *Coykendall v. Robinson,* 39 *N.J.L.* 98, 100–01 (E. & A. 1876).

[*Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 536–37, 666 *A.*2d 146 (1995).]

## A.

The immunity provided in *N.J.S.A.* 34:15–8 states that an employee's exclusive remedy for an accident that arises out of and during the course of employment is workers' compensation and

the employer "shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring [to such an employee], except for intentional wrong." *Ibid.*

The Appellate Division in this case accurately summarized the decisional law interpreting the meaning of the "intentional wrong" exception. In its unpublished opinion, the court stated that in *Millison v. E.I. duPont de Nemours & Co.*, 101 *N.J.* 161, 501 *A.*2d 505 (1985), the first case to address the issue,

> the Court concluded that an intentional wrong is not strictly a deliberate assault and battery. *Id.* at 177[-78, 501 *A.*2d 505]. Instead, the Court adopted a "substantial certainty" standard. *Id.* at 178 [501 *A.*2d 505]. In adopting this standard, the Court relied on language from W. Prosser and W. Keeton, *The Law of Torts,* (5th [sic] ed.1984). The Court was in agreement with Dean Prosser, stating that:
>
>> [T]he mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.
>>
>> [*Millison, supra,* 101 *N.J.* at 177, 501 *A.*2d 505 (quoting W. Prosser and W. Keeton, *supra,* § 8 at 36).]
>
> Thus, simply being aware of the risk of harm does not equate to having knowledge of a substantial certainty of harm. *Id.* at 178 [501 *A.*2d 505]. The Court concluded that substantial certainty needs to be "virtual certainty." *Ibid.* [citation omitted].
>
> The context within which the conduct occurs is also as important in defining an intentional wrong. *Id.* at 179 [501 *A.*2d 505]. That is, for the injury to be the result of an intentional wrong, it must be an injury that the Legislature did not contemplate to be part and parcel of workplace hazards intended to be covered by the Act; nor can the circumstances giving rise to the injury be within the contemplation of the Act. *Ibid. Millison,* thus, established a two-prong test for determining an intentional wrong: conduct and context, both of which must be met by plaintiff. *Ibid.*
>
> One of the questions that has emerged from post *Millison* litigation is whether intentionally removing or disabling a safety device from workplace equipment satisfies the definition of intentional wrong. *See Mabee v. Borden, Inc.,* 316 *N.J.Super.* 218, 230–231 [720 *A.*2d 342] (App.Div.1998) (holding that whether alteration or removal of a safety device is an "intentional wrong" will be dependent on the facts of each case); *Calderon v. Machinenfabriek Bollegraaf Appingedam BV,* 285 *N.J.Super.* 623, 637 [667 *A.*2d 1111] (App.Div.1995) (suggesting in dicta that there could be "liability on the part of a corporation whose management ... [has] removed safety devices so that ... it is practically certain that some employee [will] be injured."), *certif. denied,* 144 *N.J.* 174 [675 *A.*2d 1122] (1996).

Recently, our Supreme Court in *Laidlow v. Hariton Machinery Co.*, 170 *N.J.* 602 [790 *A.*2d 884] (2002), addressed whether removing a safety device is an intentional wrong. Before beginning its analysis, the Court reiterated the meaning of *Millison*. It stated:

> [I]n order for an employer's act to lose the cloak of immunity of *N.J.S.A.* 34:15-8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.
>
> [*Laidlow, supra,* 170 *N.J.* at 617, 790 *A.*2d 884.]

In *Laidlow*, "an injured employee claim[ed] that his employer ha[d] removed a safety device from a dangerous machine, knowing that the removal was substantially certain to result in injury to its workers...." *Id.* at 606 [790 *A.*2d 884]. Plaintiff, Rudolph Laidlow, was employed by AMI–DDC, Inc. (AMI), an electrical products manufacturing company. *Id.* at 607 [790 *A.*2d 884]. While using a rolling mill at work he suffered a "degloving injury resulting in partial amputations of the index, middle, ring and small fingers of his dominant left hand." *Ibid.* Laidlow's glove was caught in an unguarded nip point which "pulled [his hand] toward the mill's rollers." *Ibid.* This was not the first time an employee had gotten [his or her] glove snagged on the nip point, but this was the first injury that resulted. *Id.* at 607–[0]8 [790 *A.*2d 884]. Those prior "close calls" occurred on two occasions and both times the employees reported it to AMI. *Id.* at [607–08, 790 *A.*2d 884].

AMI purchased a safety guard for the mill in 1979, but it was purposely kept disengaged up until the date of Laidlow's accident in 1992. [*Id.* at 608, 501 *A.*2d 505]. The "guard was placed in its proper position only when Occupational Safety and Health Administration (OSHA) inspectors came to the plant." *Ibid.* Prior to Laidlow's accident he had asked one of his superiors three times to restore the guard to its proper working position. *Ibid.* AMI ignored those requests, and conceded "that the guard was removed for 'speed and convenience.'" *Ibid.* Laidlow retained a professional engineer who certified that AMI "'knew there was a virtual certainty of injury to Mr. Laidlow or a fellow work[er] arising from the operation of the mill without a guard.'" *Id.* at 608–[0]9 [501 *A.*2d 505].

The Court concluded that a jury could find Laidlow's employer knew that it was "substantially certain that the removal of the safety guard would result eventually in injury to one of its employees." *Id.* at 622 [501 *A.*2d 505]. The Court based this on the evidence showing "prior close calls, the seriousness of any potential injury that could occur, Laidlow's complaints about the absent guard, and the guilty knowledge of AMI as revealed by its deliberate and systematic deception of OSHA." *Ibid.* Thus, it was inappropriate to grant summary judgment on the substantial certainty issue as a jury question was presented. *Ibid.*

The Court also concluded that the context prong of *Millison* would be met if Laidlow proved his allegations. As the Court said:

> Indeed, if an employee is injured when an employer deliberately removes a safety device from a dangerous machine to enhance profit or production, with substantial certainty that it will result in death or injury to a worker, and also

deliberately and systematically deceives OSHA into believing that the machine is guarded, we are convinced that the Legislature would never consider such actions or injury to constitute simple facts of industrial life. On the contrary, such conduct violates the social contract so thoroughly that we are confident that the Legislature would never expect it to fall within the Worker's Compensation bar.

[*Laidlow, supra,* 170 *N.J.* at 622, 790 *A.2d* 884.]

The Court was quick to add that its finding did not establish a *"per se* rule that an employer's conduct equates with an 'intentional wrong' within the meaning of *N.J.S.A.* 34:15–8 whenever that employer removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation. Rather, our disposition in such a case will be grounded in the totality of the facts contained in the record and the satisfaction of the standards established in *Millison* [ ... ]." *Id.* at 622–23 [501 *A.2d* 505].

The Court examined the ruling in *Mabee, supra,* where we applied the *Millison* standard to a situation in which an employer was accused of intentionally removing a safety device. The Court fully embraced *Mabee* when it said that "removal of a safety guard can meet the intentional wrong standard; that such a determination requires a case-by-case analysis; that the facts of *Mabee* presented a jury issue on substantial certainty; and that, if proved, those facts would meet the context prong of *Millison*." *Laidlow, supra,* 170 *N.J.* at 619 [790 *A.2d* 884] [ (footnote omitted by Appellate Division) ].

. . . .

In *Laidlow, supra,* the Court explained at length what is expected in deciding motions for summary judgment based on the Workers' Compensation bar set forth in *N.J.S.A.* 34:15–8. It stated that:

In general, the same facts and circumstances will be relevant to both prongs of *Millison.* However, as a practical matter, when an employee sues an employer for an intentional tort and the employer moves for summary judgment based on the Workers' Compensation bar, the trial court must make two separate inquiries. The first is whether, when viewed in a light most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was substantially certain that a worker would suffer injury. If that question is answered affirmatively, the trial court must then determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar. Resolving whether the context prong of *Millison* is met is solely a judicial function. Thus, if the substantial certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, the employer's motion for summary judgment should be denied; if not, it should be granted.

[*Id.* at 623, 790 *A.2d* 884.]

The Court continued, stating that:

Obviously, the proofs at trial may not track the employee's allegations. Thus, the employer may, even after a jury returns a verdict in the employee's favor regarding substantial certainty, apply to the trial court for reconsideration of the context issue based on the difference between the facts actually established at trial and what plaintiff alleged would be proved. With that possibility in mind, where the evidence is in conflict regarding the allegations relied on by the trial court.for its preliminary context evaluation, the court should secure from the jury a resolution of those conflicts by way of a carefully crafted jury verdict form.

[*Id.* at 623–24, 790 *A.*2d 884.]

The Appellate Division applied the above legal principles to the facts and inferences that were most favorable to plaintiff and concluded that, even if defendant disabled the safety lever on the snow blower,

there was a lack of evidence that defendant knew there was a virtual certainty that an employee would be injured from using the snow blower in that condition. There is no expert testimony or other evidence suggesting defendant knew that disabling the safety device was substantially certain to harm plaintiff. As stated in *Millison* and reiterated in *Laidlow,* merely knowing of the existence of a risk of injury is insufficient. There needs to be virtual certainty. There is no evidence of such certainty here.

To conclude that the mere act of disabling a safety device is substantially certain to cause harm to an employee is to say such an act by an employer is a *per se* intentional wrong. In *Laidlow* our Supreme Court clearly stated that it is not *per se* an intentional wrong to "remove[ ] a guard or similar safety device from equipment or machinery[. . . .]" *Id.* at 622–23 [790 *A.*2d 884].

. . . .

Determining whether the context prong is satisfied, is strictly a judicial function. *Laidlow, supra,* 170 *N.J.* at 623 [790 *A.*2d 884]. In *Laidlow* and *Mabee* [,] where a safety device was disabled, it was held that because the circumstances under which the employer acted were so egregious the actions could not have been contemplated by the Legislature in enacting the Act. Here, before the motion judge, there was no evidence suggesting defendant acted in a manner inconsistent with what is part and parcel of the workplace. Missing from the facts here are the deception and blatant disregard for the plaintiff's well-being that was present in *Mabee* and *Laidlow,* or evidence of conduct that demonstrates defendant "violate[d] the social contract so thoroughly that we are confident the Legislature would never expect it to fall within the Workers['] Compensation bar." *Laidlow, supra,* 170 *N.J.* at 622 [790 *A.*2d 884]. Although plaintiff's injury is regrettable, the proofs here do not support a finding that his injury is "more than a fact of life of industrial employment and . . . plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize." *Laidlow, supra,* 170 *N.J.* at 617 [790 *A.*2d 884]. Defendant's motion for summary judgment should have been granted.

We agree with the Appellate Division and affirm substantially for the reasons expressed by that court.

## B.

We add the following to the Appellate Division's well-reasoned analysis. The snow blower is not part of the equipment or machinery used to produce or install sprinklers in commercial buildings—the business purpose of defendant. The snow blower is a consumer product rather than a piece of industrial production machinery. As the user of a consumer product, plaintiff concedes that the snow blower contained two visible warning labels with respect to dangers associated with inserting a body part into the chute. Therefore, the presence of the warning labels, the consumer-user expectation and obviousness of danger incorporated into our Products Liability Act, *N.J.S.A.* 2A:58C–3a(2), and the presumption that users of consumer products will heed the warnings with respect to dangers inherent in the consumer product should be considered under the context prong articulated in *Millison.*

Apart from whether plaintiff should be subject to comparative negligence, *see Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 166–67, 406 *A.*2d 140 (1979), his conduct can be considered in analyzing the context prong and as an intervening-superceding cause that affects the substantial certainty prong as well. *See Johansen v. Makita U.S.A., Inc.*, 128 *N.J.* 86, 102, 607 *A.*2d 637 (1992). Contrary to the assertions in Justice Albin's dissent, *post* at 380–85, 823 *A.*2d at 779–80, this is a case in which plaintiff knew or should have known the propellers were operating before inserting his hand into the chute when the evidence is viewed in a light most favorably to plaintiff. He started the engine on the snow blower, placed the gear lever into a forward-motion position and then observed snow being ejected through the chute without, according to him, engaging the safety lever. Although plaintiff did not recall seeing the visible danger warning labels on the machine, he admitted that they were probably there before the accident. The pictures presented as evidence clearly demonstrate

that the warning labels were written in contrasting colors and were located on the machine's hazardous areas, including the discharge chute. The warning decals contained the word "DANGER" with a pictorial description of a hand near a rotating blade or propeller inside the discharge chute. Those warning labels were adequate regardless of whether plaintiff recalls seeing them. *See N.J.S.A.* 2A:58C–4. Nonetheless, he inserted his hand into the chute, not once, but two or three times. After using his hand to push downward. on the snow that was clogging the chute, plaintiff observed the snow as it was propelled ˉout of the chute before his accident. His hand was injured on the second or third unclogging maneuver. In the circumstances, it was not the taping but the insertion of the hand into the chute with the knowledge that the propellers were operating that created the virtual certainty. Inserting the hand into the chute was an intervening cause, defined as "[a]n event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury." *Black's Law Dictionary* (7th ed.1999).

Assuming, as we must, that defendant was responsible for the taping, its alleged conduct can be characterized at most as grossly negligent in that it may "amount[ ] to deliberately taking risks with employees' [safety]," but "the mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short" on the "substantial certainty" prong. *Millison, supra,* 101 *N.J.* at 179, 501 *A.*2d 505. Moreover, the claim of negligent training of plaintiff in the use of the snow blower is a red herring. No special training was required to be given for the snow blower because it is a consumer product. The warning labels adequately informed plaintiff not to put his hand into the chute while the propellers were operating. There is no claim of a defect with respect to the design, the manufacturing, or the warning within the meaning of our Products Liability Act, *N.J.S.A.* 2A:58C–1 to – 11. Even if there was a duty to train plaintiff in the proper use of the snow blower, neither negligence nor gross negligence can

satisfy the "intentional wrong" requirement of *N.J.S.A.* 34:15–8. *Millison, supra,* 101 *N.J.* at 183, 501 *A.*2d 505.

Nor can the context prong, which is a legal determination, be satisfied because plaintiff knew or should have known that the propellers were operating when he inserted his hand into the chute; the labels on the machine clearly warned him of the dangers in this consumer product; and the danger inherent in the snow blower was obvious. Those facts coupled with the presumption that a proper warning of danger will be heeded, *Coffman v. Keene Corp.,* 133 *N.J.* 581, 597–98, 628 *A.*2d 710 (1993), are dispositive on the context prong. Our law does not impose a duty on an employer to prevent an employee from engaging in self-damaging conduct absent a showing that the employer encouraged such conduct or concealed its danger. No such proofs were presented in this case. Furthermore, when the risk of danger is obvious in a consumer product, our Legislature has provided an objective standard for measuring whether a user of consumer goods has engaged in proper self-protective measures. It has stated that if a consumer or user is injured while using a consumer product, as opposed to "industrial machinery or other [production] equipment used in the workplace," and "[t]he characteristics of the product are known to the ordinary consumer or user, and the harm was caused by an unsafe aspect of the product ... that would be recognized by the ordinary person who uses or consumes the product with the ordinary knowledge common to the class of persons for whom the product is intended," that consumer or user cannot recover from the manufacturer or seller of that product under a theory of defective design. *N.J.S.A.* 2A:58C–3a(2). The same principle should apply when a consumer product is involved in an "intentional wrong" under *N.J.S.A.* 34:15–8.

Under the foregoing objective statutory test, a plaintiff consumer or user is presumed to have the knowledge of the class of reasonable foreseeable plaintiffs. *N.J.S.A.* 2A:58C–3a(2). Application of the legislative test to this case means that under the *Millison–Laidlow* standard, even if the employer disengaged the

safety lever, that conduct cannot satisfy the intentional wrongdoing standard. The "substantial certainty" prong and the legal concept of causation are intertwined. Here, the natural and continuous sequence of events was broken by an efficient intervening cause when plaintiff placed his hand into the chute two or three times knowing that the propellers were operating. Therefore, in a legal sense, the alleged taping of the safety lever was not a substantial factor in causing the injury but "simply presents the [surrounding] condition[s] under which the injury was received." *Brown v. United States Stove Co.*, 98 *N.J.* 155, 172, 484 *A.*2d 1234 (1984) (citations omitted).

Finally, the facts of this case are analogous to the case of a carpenter whose hand is injured on a power saw when the carpenter removes a piece of wood from an unguarded saw blade. In both instances, the Legislature contemplated that those accidents would be part and parcel of workplace hazards covered by workers' compensation.

Consequently, considering the evidence in a light most favorable to plaintiff, his proofs failed to make a *prima facie* showing that either of the *Millison–Laidlow* prongs for an intentional tort under *N.J.S.A.* 34:15-8 could be established. For that reason, summary judgment should have been granted. Having failed as a matter of law to establish the elements of an intentional tort at the conclusion of all the evidence, judgment for defendant notwithstanding the verdict should have been entered. "[T]he failure to present evidence warranting submission of a factual issue to the jury is the functional equivalent of a waiver of the right to have a jury decide the case." *Brill, supra*, 142 *N.J.* at 537, 666 *A.*2d 146.

### III.

The judgment of the Appellate Division is affirmed.

ZAZZALI, J., dissenting.

Because I believe that evidence that an employer disabled or knowingly tolerated the disabling of a safety device creates a

rebuttable presumption that the employer knew harm to an employee was substantially certain to result, *Mull v. Zeta Consumer Products,* 176 *N.J.* 385, 393–94, 823 *A.2d* 782, 786–87 (2003) (Zazzali, J., concurring), I respectfully dissent from the majority's conclusion that the trial court erred in denying defendant's motion for summary judgment.

As the panel below noted, "that defendant was responsible for disabling the safety device on the snow blower" was "an inference that could be drawn." Defendant admitted in its answer that the "snow blower was owned and/or under the control of the defendant/employer." In addition, plaintiff's deposition testimony indicated that the snow blower's safety lever was disabled at the time of plaintiff's injury. Applying the rebuttable presumption I propose and viewing the facts in the light most favorable to plaintiff, a material issue of fact exists in respect of whether a known substantial certainty of harm was present. Accordingly, the trial court's denial of defendant's motion for summary judgment was appropriate. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995).

The majority states in dicta that defenses such as "the presence of the warning labels, the consumer-user expectation and obviousness of danger incorporated into our Products Liability Act, *N.J.S.A.* 2A:58C–3a(2), and the presumption that users of consumer products will heed the warnings with respect to dangers inherent in the consumer product should be considered under the context prong articulated in *Millison.*" *Ante* at 375, 823 *A.2d* at 776. Notwithstanding my opposition to continued application of the context prong, *see Crippen v. Central Jersey Concrete,* 176 *N.J.* 397, 413–14, 823 *A.2d* 789, 799–800 (2003) (Zazzali, J., concurring), I agree with Justice Albin's conclusion that the defenses available to a product liability defendant under *N.J.S.A.* 2A:58C–3 should not afford an employer summary judgment under *N.J.S.A.* 34:15–8 without a further inquiry into the culpability of that employer's conduct. I do believe, however, that to the extent that an employer knows harm to an employee is unlikely to

result because of the presence of warning labels or the obviousness of danger, those facts may be probative of whether the degree of risk created by the employer is tantamount to a "known substantial certainty of harm." Accordingly, when an employer proffers such rebuttal evidence it generally should be admissible to aid the jury in determining whether the employer possessed the requisite state of mind to justify liability in intentional tort.

I would affirm the trial court's denial of summary judgment.

ALBIN, J., dissenting.

The standard of review on a motion for judgment notwithstanding the verdict is to view the evidence in the light most favorable to the plaintiff. *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969). Had the majority followed that simple admonition and not cast itself as the seventh juror, it would not have set aside the verdict rendered by the jury in favor of plaintiff. Instead of applying traditional principles of appellate review, the majority has sifted through the record to support its own theory of the case. I find ample evidence in the record to support the verdict of the jury. I also believe that the time has come to enunciate a clear and definitive rule that an employer's willful and knowing disengagement or removal of a safety device, the purpose of which is to protect an employee from death or serious bodily injury, constitutes an intentional wrong under *N.J.S.A.* 34:15–8, stripping the employer of immunity from a common-law tort action. *Cf. Mull v. Zeta Consumer Prods.*, 176 *N.J.* 385, 393–96, 823 *A.*2d 782, 786–88 (2003) (Zazzali, J., concurring) (proposing rebuttable presumption that employer knew harm to employee was substantially certain to result if employer knowingly disabled or tolerated disabling of safety device). I, therefore, respectfully dissent.

The following evidence supported the verdict rendered by the jury. Whitesell Construction hired plaintiff to install sprinkler systems in commercial buildings. On January 9, 1996, plaintiff

reported to work to do the job for which he was trained and hired. Due to a recent storm, snow covered defendant's property and plaintiff was asked by defendant's vice-president to help clear the property by using the company's snow blower. Plaintiff had used a snow blower only once before in his life, approximately four years earlier in the course of his employment with defendant, and on that occasion only for a few minutes. In this case, plaintiff was unfamiliar with the Toro model 1132 snow blower and given as little as five minutes instruction on its use by another employee. In that crash course, plaintiff was not alerted to nor did he see any warnings on the snow blower. He did not know that there were blades that rotated in the ejection chute of the machine. He did not know and was not told that on the handlebar of the snow blower was a safety lever that activated the blades only when the lever was depressed. He did not know and was not told that the safety lever was rendered useless by one of defendant's agents who used electrical tape to bind the lever to the handlebar, leaving the blades in the chute constantly rotating.

Unfamiliar and unschooled in the use of that dangerous machine, plaintiff went about the task he was asked to do, to clear the walkway of snow. When the snow got clogged in the ejection chute, knowing no better, unaware that the safety lever had been disengaged, plaintiff placed his hand into the chute to clear the snow. The rotating blades in the chute mangled plaintiff's fingers.

In returning a verdict in favor of plaintiff, the jury unanimously concluded that: 1) defendant "intentionally disabled the deadman's switch on the snow blower with the intention that someone would be injured or so that it was substantially or virtually certain that someone would be injured" and 2) the intentional disabling of the deadman's switch was a proximate cause of plaintiff's injury. The jury awarded plaintiff $160,000 in damages. The trial court denied the defense motion for a judgment notwithstanding the verdict. The Appellate Division reversed and entered an order dismissing plaintiff's complaint on the basis that the employee's exclusive remedy for his work-related injury was workers' com-

pensation pursuant to *N.J.S.A.* 34:15–8 because the employer did not engage in an "intentional wrong." Our Court, in my estimation, has erroneously affirmed that judgment.

The majority accepts as truth disputed facts and imputes to plaintiff knowledge of the dangers of the snow blower based on warning decals on the machine that were never seen by plaintiff and may have been obstructed by snow on the day of the accident. Plaintiff testified to the rushed circumstances that placed him in control of the machine. The majority argues that in light of the warning decals, plaintiff's insertion of his hand into the chute was an intervening cause, which absolved the employer of liability. First, the purpose of the safety lever was to ensure that such an "intervening cause" would never happen. Second, the theory of intervening causation was a matter for the jury to decide rather than this Court.

Moreover, the majority treats the snow blower as though it were a consumer product purchased by plaintiff, as though under the circumstances plaintiff had the time to read an instruction manual and the luxury to inspect the machine for warning labels. The majority ignores the reality of the workplace conditions of plaintiff, who with little training in a task not part of his customary duties had a dangerous machine, stripped of its safety device, placed into his hands so that the employer could have his walkway cleared of snow. The majority imports into the analysis "consumer-use" expectations, *N.J.S.A.* 2A:58C–3a(2), as they apply in the New Jersey Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11, in order to conclude that plaintiff acted with gross negligence in the face of an obvious danger. That analysis is misplaced in the context of the workplace and would turn the clock back on worker safety, diverting attention from intentional acts of employers that expose employees to foreseeable and avoidable injuries. *See Brunell v. Wildwood Crest Police Dep't,* 176 *N.J.* 225, 235–38, 822 *A.*2d 576 (2003) (discussing history and purpose of Workers' Compensation Act). Safety devices are required on machines, in part, to protect workers from their own errors, whether from

inattention or neglect. An employer who intentionally removes or disengages a safety device knowing with substantial certainty that serious injury to a worker will follow should not reach safe haven because the worker was careless not to protect himself. Machinery in the workplace is no less dangerous because it may have some other consumer or commercial use. Plaintiff was a worker and the use of the snow blower at the behest of his employer did not transform him into a consumer of the product.

I also would find that the willful and knowing disengagement of a safety device that is intended to protect the worker from serious bodily injury or death removes this case from the workers' compensation scheme and permits the worker to file a common-law claim against his employer. It is a simple and clear rule that will be easily understood by employers, and will likely deter them from cutting corners for the sake of profits and short-term efficiency at the expense of worker safety. It is a rule that will likely save lives and decrease maiming injuries.

The progressive development of our workers' compensation laws has been leading us toward that destination. Our most recent exposition on this subject is found in *Laidlow v. Hariton Machinery Co.*, 170 *N.J.* 602, 790 *A.2d* 884 (2002), which reaffirmed the standard set forth in *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 177–79, 501 *A.2d* 505 (1985):

> [I]n order for an employer's act to lose the cloak of immunity of *N.J.S.A.* 34:15–8, two conditions must be satisfied: (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.
>
> [*Laidlow, supra,* 170 *N.J.* at 617, 790 *A.2d* 884.]

In *Laidlow,* the Court found sufficient evidence in the record to support the "intentional wrong" standard. There, the employer purposely disengaged a safety device from a machine until the employee, who operated the machine, suffered a serious, but preventable, injury. Before the "accident," the safety guard was placed in its proper position only for the limited purpose of

satisfying inspectors from the Occupational Safety and Health Administration (OSHA) that all was well in the plant. The employee had asked his superiors on three occasions to restore the safety guard to its proper position, and each request was denied because the safety guard interfered with "speed and convenience." *Id.* at 608–09, 790 *A.*2d 884. We concluded that a jury could find that it was "substantially certain that the removal of the safety guard would result eventually in the injury to one of its employees." *Id.* at 622, 790 *A.*2d 884. The Court eschewed a *"per se"* rule that an employer's conduct will meet the "intentional wrong" standard under *N.J.S.A.* 34:15–8 "whenever that employer removes a guard or similar safety device from equipment or machinery, or commits some other OSHA violation." *Id.* at 622–23, 790 *A.*2d 884. The Court held that each case must be decided on the totality of facts contained in the record. *Id.* at 623, 790 *A.*2d 884.

*Laidlow* was a laudable and timely expansion of the *Millison* doctrine. I believe, however, we must go further and recognize that in the year 2003 an employer's willful and knowing removal or disengagement of a safety device intended to protect a worker from serious bodily injury or death is not a "simple fact" of industrial life, that such conduct alone is a total breach of the social contract between the employee and employer, and that under those circumstances the employer should be barred from the safe harbor of the Workers' Compensation Act. I am convinced that the Legislature would not intend an employer's utter and intentional disregard for the safety of workers to bar an injured employee a common-law cause of action. Whether there is deception of OSHA inspectors, as was the case in *Laidlow,* or not, should not be determinative in the analysis. Removing or disabling a safety device for no purpose other than efficiency and economy should be the *sine qua non* for a cause of action. Temporary removal or disengagement of a safety device for repair, maintenance, or some other benign purpose would not be actionable. That test has the benefit of providing a clear message of what is no longer an acceptable fact of industrial life. There must be symmetry in the law. It should not be that a victim has a

product-liability cause of action against a manufacturer for failing to provide a safety device that could have prevented a foreseeable injury, *see, e.g., Ramos v. Browning Ferris Indus. of S. Jersey, Inc.*, 103 *N.J.* 177, 183–85, 510 *A.2d* 1152 (1986); *Stephenson v. R.A. Jones & Co.*, 103 *N.J.* 194, 197–99, 510 *A.2d* 1161 (1986), but no common-law tort remedy against an employer, who deliberately removes the safety device.

For those reasons, I would reverse the judgment of the Appellate Division, which set aside the jury verdict awarding plaintiff damages for his injuries.

*For affirmance*—Chief Justice PORITZ and JUSTICES COLEMAN, VERNIERO, and LaVECCHIA—4.

*Dissenting*—Justices ZAZZALI and ALBIN—2.